IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 18, 2019 Session

## JARED EFFLER, ET AL. v. PURDUE PHARMA L.P., ET AL.

### Appeal from the Circuit Court for Campbell County
### No. 16596    John D. McAfee, Judge

_____

### No. E2018-01994-COA-R3-CV

_____

This appeal concerns the interpretation of the Drug Dealer Liability Act, Tenn. Code Ann. § 29-38-101, -116 ("DDLA"). A number of Tennessee district attorneys ("the District Attorney Plaintiffs"), as well as two minor children through their guardian ad litem ("Plaintiffs," all together), sued certain drug manufacturers ("Manufacturer Defendants") and others in the Circuit Court for Campbell County ("the Trial Court") alleging the diversion of opioids.[1] Manufacturer Defendants filed a motion to dismiss. The Trial Court, in granting the motion to dismiss, held that the DDLA does not apply to manufacturers who lawfully produce drugs and that Plaintiffs had failed to state a claim upon which relief can be granted. Plaintiffs appeal, arguing that their complaint contained allegations sufficient to withstand the motion to dismiss. Manufacturer Defendants contend that the DDLA applies to "street dealers," not regulated entities such as themselves. In addition, Manufacturer Defendants argue that the District Attorney Plaintiffs lack standing. We hold, first, that the DDLA allows district attorneys to pursue DDLA claims on behalf of the political subdivisions within their respective judicial districts. Thus, the District Attorney Plaintiffs have standing. We hold further that, taking as true Plaintiffs' detailed allegations that Manufacturer Defendants knowingly participated in the diversion of opioids, Plaintiffs have stated claims upon which relief can be granted. We reverse the judgment of the Trial Court and remand for this case to proceed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and THOMAS R. FRIERSON, II, J., joined.

_____

[1] "Diversion" means, for these purposes, the redirection of a drug from a proper use to an illicit use.

Michael J. Wall, James G. Stranch, III, J. Gerard Stranch, IV, Tricia Herzfeld, Benjamin A. Gastel, and Anthony Orlandi, Nashville, Tennessee, for the appellants, Baby Doe #1 and Baby Doe #2, as well as District Attorneys Jared Effler, Eighth Judicial District; Charme Allen, Sixth Judicial District; Dave Clark, Seventh Judicial District; Russell Johnson, Ninth Judicial District; Stephen Crump, Tenth Judicial District; Jimmy Dunn, Fourth Judicial District; and, Mike Taylor, Twelfth Judicial District.[2]

Ronald S. Range, Jr. and Chad E. Wallace, Johnson City, Tennessee; Ingo W. Sprie, Jr., New York, New York; and, R. Stanton Jones, Washington, D.C., for the appellees, Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc.

Aubrey B. Harwell, Jr., James G. Thomas, Mariam A. Stockton, and William J. Harbison, II, Nashville, Tennessee; Sheila L. Birnbaum, Mark S. Cheffo, and Bert Wolff, New York, New York, for the appellees, Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc.

Jessalyn H. Zeigler and Sarah B. Miller, Nashville, Tennessee; David H. Stanifer, Tazewell, Tennessee; and, Brien J. O'Connor and Andrew J. O'Connor, Boston, Massachusetts, for the appellee, Mallinckrodt LLC.

Tim Warnock and Stuart Burkhalter, Nashville, Tennessee; Tinos Diamantatos (admitted *pro hac vice*) and Megan R. Braden (admitted *pro hac vice*), Chicago, Illinois; Steven A. Reed (admitted *pro hac vice*), Philadelphia, Pennsylvania; and, Brian M. Ercole, Miami, Florida, for the appellee, Teva Pharmaceuticals USA, Inc.

Jerry N. Estes, Nashville, Tennessee, for amicus curiae, the Tennessee District Attorneys General Conference.

Douglas S. Johnston, Nashville, Tennessee, for amicus curiae, the Tennessee Municipal League.

Andrew E. Farmer, Sevierville, Tennessee, for amicus curiae, the United Way of Greater Kingsport.

Gary R. Wade, Knoxville, Tennessee, for amici curiae, the local Chambers of Commerce of Bristol, TN/VA and Johnson City.

---

[2] The District Attorney Plaintiffs purport to act in their official capacities on behalf of the political subdivisions within their respective judicial districts. Their standing to pursue DDLA claims in this manner is an issue we address herein.

# OPINION

## Background

In this appeal, we address questions regarding the DDLA, an Act establishing a civil cause of action for persons injured by illegal drugs against persons participating in the illegal drug market in Tennessee. This case began in September 2017 when Plaintiffs sued Manufacturer Defendants, as well as a pain clinic and certain individual defendants, in the Trial Court. Plaintiffs pursued DDLA and public nuisance claims stemming from the alleged diversion of prescription opioids. The Attorney General of Tennessee moved to intervene. Plaintiffs later voluntarily dismissed their nuisance claims as well as any DDLA claim on behalf of the State, and consequently the Attorney General withdrew his motion to intervene. In June 2018, Plaintiffs filed their Third Amended Complaint, which is the operative complaint. In the Third Amended Complaint, Plaintiffs pressed forward with their DDLA claims on behalf of the political subdivisions within the District Attorney Plaintiffs' judicial districts and the Baby Doe plaintiffs.

As this case was resolved on a motion to dismiss, the allegations contained in the Third Amended Complaint are of central importance. We therefore deem it appropriate to set out some, though not all, of the Third Amended Complaint, which takes up over an entire volume of the technical record. Plaintiffs alleged, in part:

> 276. After helping to create the opioid epidemic, Purdue has worked to sustain that illegal opioids market and to continue profiting from it.
> 277. There were nearly twelve million (11,788,252) prescriptions of popular branded and generic opioid products containing hydromorphone, oxymorphone, oxycodone, and hydrocodone in the State of Tennessee for the 24-month period of September, 2015 through August, 2017 according to IMS data.
> 278. Purdue's average market share of oxycodone in Tennessee from 2015 to 2017 was nearly 5%, led by its popular brand product OxyContin. Based on this market share over the course of this same period, OxyContin was prescribed approximately 32,750 times in Knoxville (population 186,239), 19,550 times in Chattanooga (population 177,571), and 3,417 times in Cleveland, TN (population 44,271).
> 279. Purdue knows exactly how much of its product flows into the Opioid Epidemic Affected Counties. On the heels of its 2007 plea agreement, Purdue approached wholesalers and struck agreements allowing the company access to their sales reports. This data allowed Purdue's security team to track all wholesalers' OxyContin sales to individual pharmacies, down to the pill.

280. Purdue is also put on notice when OxyContin is likely being diverted in the Opioid Epidemic Affected Counties, and can react by halting shipments into the affected areas. In July 2016, Purdue's general counsel acknowledged that the company is "required to monitor and report suspicious orders to the DEA," and that while Purdue cannot halt shipments to suspect pharmacies, they "can and have reduced the product they ship to a wholesaler if they have concerns about the customer at the end of the supply chain."

281. Purdue tracked physicians' prescribing practices by reviewing pharmacy prescription data it obtained from IMS Health. Rather than reporting highly suspicious prescribing practices, Purdue used the data to identify physicians who prescribed some opioids and might be persuaded to prescribe more.

\*\*\*

314. Mallinckrodt knowingly entered and participated in the illegal drug market in Tennessee and the Opioid Epidemic Affected Counties. Mallinckrodt is aware of the extraordinary volume of opioid prescriptions in Tennessee in relation to other states referenced above, as well as the flood of opioids into East Tennessee at levels that cannot be medically justified. As reported by the CDC, Tennessee's oxycodone prescription rate is twenty-two times that of Minnesota's. Mallinckrodt knew (and knows) that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids, including Mallinckrodt's products.

315. Mallinckrodt knowingly participated in the illegal drug market in Tennessee and elsewhere by knowingly shirking its responsibility to detect and investigate suspicious orders, for which it was cited by the DEA. It also admitted that it had failed to stop downstream diversion despite being on notice that diversion was occurring. Despite controlling nearly 25% of the opioids market in Tennessee, Mallinckrodt has failed to take meaningful or effective measures to stop the open and notorious downstream diversion that precipitated its July 2017 settlement. To the contrary, it has continued to supply opioids into Tennessee, East Tennessee, and the Opioid Epidemic Affected Counties unabated, despite awareness that a substantial volume of those drugs are being abused and diverted into an illegal market.

316. Additionally, Mallinckrodt possesses, or has access to, the non-public information necessary to monitor, investigate, report, and prevent suspicious orders and illegal diversion, but has knowingly failed to do so.

***

332. Endo knowingly entered and participated in the illegal drug marketing in Tennessee and the Opioid Epidemic Affected Counties. Endo is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. Endo knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids, including Endo's products. On information and belief, Endo also knowingly participated in the illegal drug market in the Opioid Epidemic Affected Counties by supplying quantities of its products to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion.

333. Additionally, Endo possesses, or has access to, the non-public information necessary to monitor, investigate, report, and prevent suspicious orders and illegal diversion, but has knowingly failed to do so.

***

338. Teva continues to flood East Tennessee with opioids in an amount that clearly contributes to the illegal opioid drug market.

339. Teva's generic oxycodone and hydrocodone products both represent the largest market share for either product throughout Tennessee, as well as specific cities in and around the Opioid Epidemic Affected Counties, according to IMS Health Data. These quantities of opioid pills clearly exceed the number that would be appropriate for normally prescribed therapeutic use and contribute to the illegal East Tennessee opioid market.

340. On information and belief, Teva also knowingly participated in the illegal drug market in Tennessee by supplying suspicious quantities of its products to suspect physicians and pharmacies in Tennessee, without disclosing suspicious orders as required by applicable regulations.

***

349. Upon information and belief, Purdue, Mallinckrodt, Endo, and Teva each maintained an internal database of HCPs [healthcare providers] suspected of inappropriately prescribing opioids. HCPs could be added to the database based on observed indicators of illicit prescribing such as excessive numbers of patients, cash transactions, patient overdoses, and unusual prescribing of the highest-strength pills. In particular, Purdue, Mallinckrodt, Endo, and Teva tracked HCPs' prescribing practices using data obtained from IMS Health, which allowed them to identify HCPs

writing excessively large numbers of prescriptions, particularly for high doses, which is a potential sign of diversion and drug dealing.

350. Purdue, Mallinckrodt, Endo, and Teva failed to cut off these HCPs' prescription opioid supply at the pharmacy level — meaning the pharmaceutical drug producers continued to generate sales revenue from their prescriptions — and failed to report the unscrupulous providers to state medical boards and state and federal law enforcement agencies.

351. Upon information and belief, Purdue, Mallinckrodt, Endo, and Teva also possess what is known as "chargeback" data from their distributors that can be used to evaluate suspicious downstream orders of prescription opioids. As reported in the Washington Post, there is an "industry-wide practice" whereby pharmaceutical drug producers pay their distributors rebates and/or "chargebacks" on prescription opioid sales. In return, the distributors provide Purdue, Mallinckrodt, Endo, and Teva with downstream purchasing information, which allows them to track their prescription opioids down the entire supply chain, all the way to the retail level.

352. Using chargeback data, Purdue, Mallinckrodt, Endo, and Teva knew — just as the prescription opioid distributors knew — the volume, frequency, and pattern of prescription opioid orders being placed and filled. By failing to report and/or prevent suspicious orders, Purdue, Mallinckrodt, Endo, and Teva enabled the supply of prescription opioids to obviously suspicious physicians and pharmacies, enabled the illegal diversion of prescription opioids, aided criminal activity and disseminated massive quantities of prescription opioids into the black market.

***

450. Having illegally distributed hydrocodone, oxycodone, oxymorphone, OxyContin, Roxicodone, and Opana, the drugs used by their birth mothers in the "place of illegal drug activity" where the birth mothers consumed them during their pregnancies, and participated in that illegal distribution during their pregnancies, Defendants are liable to Plaintiffs BABY DOE #1 and BABY DOE #2 under the DDLA even for damages caused by opioids that were acquired from distribution channels in which Defendants were a market participant.

***

465. Defendants knowingly participated in the production and/or distribution of prescription opioids that reached the Opioid Epidemic

Affected Counties during all times relevant to this complaint. For purposes of the DDLA, Defendants' "illegal drug market target community" is the entire state of Tennessee, because Defendants participated in the illegal drug market by distributing 4 ounces or more of a "specified illegal drug." Tenn. Code Ann §§ 29-38-104(8), 29-38-109(4). As noted by the Tennessee Department of Health in a 2015 presentation, the Tennessee market for hydrocodone and oxycodone pills comprised of 51 hydrocodone pills and 21 oxycodone pills for every Tennessean. Commissioner of Health Dreyzehner noted that 50% of mothers of NAS babies obtained their pills, in whole or in part, from diverted pills (28.7% solely from diverted drugs). Given that a single oxycodone tablet, on information and belief, weighs approximately 135 mg and contains at least 10 mg of opioid, there can be no question that each of Purdue, Mallinckrodt, Endo and Teva far exceeded the four-ounce level.

466. Purdue, Mallinckrodt, Endo, and Teva knowingly failed to implement effective controls and procedures in their supply chains to guard against theft, diversion, and abuse of prescription opioids, and failed to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

\*\*\*

475. The District Attorney Plaintiffs bring this action under the DDLA to hold the Defendants civilly liable for the devastation that their facilitation of the illegal opioids market in East Tennessee has wrought. In so doing, they are vindicating the stated purpose of the DDLA to undermine the sprawling illegal opioids market in their communities using civil liability.

(Footnotes omitted). In July 2018, Manufacturer Defendants filed a motion to dismiss the Third Amended Complaint, relying on Tenn. R. Civ. P. 12.02(1) and (6). On October 5, 2018, the Trial Court granted Manufacturer Defendants' motion to dismiss for failure to state a claim upon which relief can be granted. On October 22, 2018, the Trial Court directed entry of final judgment as to Manufacturer Defendants.[3] In its October 5, 2018 order granting Manufacturer Defendants' motion to dismiss, the Trial Court stated, as pertinent to this appeal:

4. The Plaintiffs seek to hold the Manufacturer Defendants liable under the Tennessee Drug Dealer Liability Act (DDLA), Tenn. Code Ann. 29-38-

---

[3] The claims against the local defendants remain active. This appeal pertains to Manufacturer Defendants only.

101, *et seq.*, for the harm caused by third parties who have illegally distributed opioid medications. Plaintiffs argue that, by over producing opioid medications and not preventing third parties from illegally distributing those medications, the Manufacturer Defendants became drug dealers participating in an "illegal drug market" and are subject to the DDLA.

5. The Manufacturer Defendants move to dismiss arguing that the plaintiffs have failed to state a claim upon which relief can be granted and assert four grounds in their motion: (1) that the plaintiffs have failed to state a claim under the DDLA; (2) that the plaintiffs have failed to link alleged damages to specific drug users; (3) that the district attorneys general lack standing to assert claims for damages allegedly incurred by counties and cities; and (4) that all claims outside the two year statute of limitation period should be barred.

LEGAL STANDARD

6. Tennessee has a high bar for granting a motion to dismiss pursuant to Tenn. R. Civ. P. 12.02(6). The court must construe the complaint in the light most favorable to the nonmoving party and presume the pleadings to be true. The motion only tests the legal sufficiency of the plaintiff's pleadings, not the strength of its proof. The motion contemplates that all relevant and material allegations in the complaint, even if true and correct, do not constitute a cause of action.

DISCUSSION

7. The DDLA provides a civil remedy for damages to persons in a community injured as a result of illegal drug use. It enables injured persons to recover damages, including attorney fees, from those persons in the community who have joined the illegal drug market. Please see Tenn. Code Ann. 29-38-102. The DDLA defines an "illegal drug market" as the support system of illegal drug related operations, from production to retail sales, through which an illegal drug reaches the user. The DDLA defines an "illegal drug" as a drug, the distribution of which is a violation of state law. Please see Tenn. Code Ann. 29-38-104.

8. The opioid medications the Manufacturer Defendants produce are legal under federal and state law and are FDA approved. The Manufacturer Defendants sell and distribute opioid medications to licensed distributors;

those licensed distributors, not the Manufacturer Defendants, thereafter control distribution of the medications. The Manufacturer Defendants and licensed distributors are registered with the Drug Enforcement Administration (DEA).

9. The plaintiffs are claiming that the Manufacturer Defendants distributed "illegal drugs" and participated in an "illegal drug market" by selling more opioid tablets than could be appropriately prescribed by doctors and by not preventing third parties from illegally diverting or improperly prescribing opioid medications. Although the original manufacturing and distribution of opioid medication may have been legal, the plaintiffs argue by failing to take necessary and appropriate steps to limit production and prevent subsequent illegal distribution subjects the Manufacturing Defendants to liability under the DDLA. In essence, the plaintiffs purport that the Manufacturer Defendants have a duty to protect the plaintiffs from the excess production of opioid medications and the criminal activity of other unrelated actors.

CONCLUSION

10. As a matter of Tennessee law, it is legal for the Manufacturer Defendants to make FDA-approved medications and sell them to DEA-registered distributors. Please see Tenn. Code Ann. 53-11-303(d), 63-1-154(a)(8). The Manufacturer Defendants have obligations to monitor and report suspicious opioid medication orders to the DEA. Please see 21 C.F.R. 1301.74(b). (The court is unaware of any such reporting obligations to counties or cities or anyone else.)

11. The Plaintiffs' complaint, even if true and correct, is void of any allegations showing that the Manufacturer Defendants distributed "illegal drugs" or participated in an "illegal drug market" as defined in the DDLA. The Manufacturer Defendants produced and distributed legal opioid medications. The Court disagrees with the plaintiff's assertion that because of the Manufacturer Defendants' business and marketing practices, the otherwise legal production and distribution of opioid medications becomes illegal by over producing and by the subsequent criminal conduct of other unrelated actors. Pharmaceutical companies that manufacture FDA-approved opioid medications and sell to DEA-licensed distributors are not "drug dealers" as contemplated by the DDLA. In other words, the DDLA does not apply to manufacturers who are legally producing and distributing

opioid medications. Therefore, the Manufacturer Defendants' Motion to Dismiss is GRANTED.

12. Having already resolved in favor of the Manufacturer Defendants, it is not necessary for the court to consider the remaining grounds to dismiss, and the court declines to do so.

Plaintiffs timely appealed to this Court.

## Discussion

Although not stated exactly as such, Plaintiffs raise the following single issue on appeal: whether the Trial Court erred by granting Manufacturer Defendants' motion to dismiss for failure to state a claim. Manufacturer Defendants raise a separate additional issue on appeal: whether the District Attorney Plaintiffs lack standing under the DDLA to bring this suit without authorization from the counties, cities, and towns they purport to represent. A number of organizations have filed amicus curiae briefs in support of Plaintiffs.

The issues on appeal require us to interpret the DDLA. Our Supreme Court has given guidance with regard to the interpretation of statutes, stating:

Statutory interpretation and the application of a statute to the facts of a case involve questions of law and are reviewed under a de novo standard of review with no presumption of correctness afforded to the trial court. *Tenn. Dep't of Corr. v. Pressley*, 528 S.W.3d 506, 512 (Tenn. 2017); *Arden v. Kozawa*, 466 S.W.3d 758, 764 (Tenn. 2015). We thus independently review the relevant provisions of the Charter without any deference to the interpretations of the Commission or the trial court. *See Pressley*, 528 S.W.3d at 512.

The overriding purpose of a court in construing a statute is to ascertain and effectuate the legislative intent, without either expanding or contracting the statute's intended scope. *Ray v. Madison Cnty., Tenn.*, 536 S.W.3d 824, 831 (Tenn. 2017); *Pressley*, 528 S.W.3d at 512. Legislative intent is first and foremost reflected in the language of the statute. *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010). "We presume that the Legislature intended each word in a statute to have a specific purpose and meaning." *Arden*, 466 S.W.3d at 764. The words used in a statute are to be given their natural and ordinary meaning, and, because "words are known by the company they keep," we construe them

-10-

in the context in which they appear and in light of the general purpose of the statute. *Lee Medical*, 312 S.W.3d at 526; *Ray*, 536 S.W.3d at 831. "We endeavor to construe statutes in a reasonable manner 'which avoids statutory conflict and provides for harmonious operation of the laws.' " *Ray*, 536 S.W.3d at 831 (citation omitted). When a statute's text is clear and unambiguous, we need look no further than the language of the statute itself. *Lee Medical*, 312 S.W.3d at 527. "We simply apply the plain meaning without complicating the task." *Pressley*, 528 S.W.3d at 513.

When, however, the language of a statute is ambiguous, we resort to rules of statutory construction and external sources in order to ascertain and give effect to the legislative intent. *Lee Medical*, 312 S.W.3d at 527; *Ray*, 536 S.W.3d at 832. These external sources may include the broader statutory scheme, the history and purpose of the legislation, public policy, historical facts preceding or contemporaneous with the enactment of the statute, and legislative history. *Lee Medical*, 312 S.W.3d at 527-28; *Ray*, 536 S.W.3d at 831-32. The language of a statute is ambiguous when it is subject to differing interpretations which yield contrary results. *In re Hogue*, 286 S.W.3d 890, 894 (Tenn. 2009). "This proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of the statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute." *Powers v. State*, 343 S.W.3d 36, 50 n. 20 (Tenn. 2011).

*Wallace v. Metro. Gov't of Nashville*, 546 S.W.3d 47, 52-53 (Tenn. 2018) (footnotes omitted). "[T]his Court traditionally gives a liberal construction to remedial statutes, so long as the legislative intent is not disturbed and the result is not clearly contrary to the language of the statutes . . . ." *Lipscomb v. Doe*, 32 S.W.3d 840, 847 (Tenn. 2000).

We first address Manufacturer Defendants' issue of whether the District Attorney Plaintiffs lack standing. Manufacturer Defendants point out that in a statutory list of persons who may bring an action under the DDLA, district attorneys are conspicuously absent. The DDLA states:

(a) One (1) or more of the following persons may bring an action for damages caused by an individual's use of an illegal drug:

(1) A parent, legal guardian, child, spouse, or sibling of the individual drug user;

(2) An individual who was exposed to an illegal drug in utero;

-11-

(3) An employer of the individual drug user;

(4) A medical facility, insurer, governmental entity, employer, or other entity that funds a drug treatment program or employee assistance program for the individual drug user, or that otherwise expended money on behalf of the individual drug user; or

(5) A person injured as a result of the willful, reckless, or negligent actions of an individual drug user.

Tenn. Code Ann. § 29-38-106(a) (2012).

Indeed, district attorneys are not mentioned. Elsewhere in the DDLA, however, there is a provision that Plaintiffs cite in support of their contention that district attorneys have standing to bring DDLA claims on behalf of the political subdivisions in their respective judicial districts. This provision provides that "[a] prosecuting attorney may represent the state or a political subdivision of the state in an action brought under this chapter." Tenn. Code Ann. § 29-38-116(a) (2012). There is no dispute that the District Attorney Plaintiffs qualify as prosecuting attorneys, but their standing to sue is disputed sharply. Manufacturer Defendants argue that Tenn. Code Ann. § 29-38-116(a) means that the state or political subdivisions of the state may retain prosecuting attorneys to represent them as counsel in a DDLA lawsuit, not that prosecuting attorneys may file DDLA lawsuits on behalf of the state or political subdivisions on their own initiative. According to Manufacturer Defendants, the District Attorney Plaintiffs lack the necessary approval from their localities to bring this lawsuit, and, therefore, lack standing.

Related to this issue, Manufacturer Defendants have filed on appeal their "Motion to Consider Post-Judgment Facts" and "Motion for Leave to File Reply Brief in Support of Motion to Consider Post-Judgment Facts" in which they bring to our attention the separate case of *Staubus v. Purdue Pharma L.P.*, Case No. C-41916, a case brought by another group of district attorneys. Manufacturer Defendants argue that a position taken by plaintiffs in that case, that the district attorneys sue in their own right, sheds further light on the wrongness of Plaintiffs' position with respect to the District Attorney Plaintiffs' standing. In their response, Plaintiffs point out, among other things, that these cases involve different plaintiffs and different local governments.

We agree with Plaintiffs that they are not bound by positions allegedly adopted by different parties in another case. That information is immaterial to our consideration of the issues and parties currently before us. Moreover, we do not even discern a real contradiction in the positions taken. Finally, this is a matter of statutory construction. It does not hinge on the positions of counsel. These filings by Manufacturer Defendants do

not aid in resolving the issue of the District Attorney Plaintiffs' standing or lack thereof. We therefore deny Manufacturer Defendants' "Motion to Consider Post-Judgment Facts" and "Motion for Leave to File Reply Brief in Support of Motion to Consider Post-Judgment Facts."

Returning to standing, we observe that Tenn. Code Ann. § 29-38-116(a), which enables prosecuting attorneys to "represent the state or a political subdivision of the state in an action" brought under the DDLA, is amenable to competing interpretations. It could mean, as Manufacturer Defendants insist, that prosecuting attorneys—such as the District Attorney Plaintiffs—simply may be called upon to serve as counsel for "the state or a political subdivision of the state . . . ." Under that interpretation, the District Attorney Plaintiffs were not at liberty to exercise their own, independent discretion to file this DDLA lawsuit on behalf of political subdivisions, and thus lack standing.

Plaintiffs' interpretation also is viable, however. In Plaintiffs' interpretation, to "represent" means what it does when a district attorney represents the State in a criminal matter. District attorneys do not obtain permission from other governmental officials before initiating a criminal prosecution, for instance. They instead act on their own discretion.

Both Plaintiffs and Manufacturer Defendants advance reasonable interpretations of the statute. This being so, we must look to the broader purposes of the DDLA to resolve the question. The legislative purpose of the DDLA is articulated as follows:

> The purpose of this chapter is to provide a civil remedy for damages to persons in a community injured as a result of illegal drug use. These persons include parents, employers, insurers, governmental entities, and others who pay for drug treatment or employee assistance programs, as well as infants injured as a result of exposure to drugs in utero, referred to in this chapter as "drug babies." The chapter will enable injured persons to recover damages from those persons in the community who have joined the illegal drug market. A further purpose of the chapter is to shift, to the extent possible, the cost of the damage caused by the existence of the illegal drug market in a community to those who illegally profit from that market. The further purpose of the chapter is to establish the prospect of substantial monetary loss as a deterrent to those who have not yet entered into the illegal drug distribution market. The further purpose is to establish an incentive for drug users to identify and seek payment for their own drug treatment from those dealers who have sold drugs to the user in the past.

Tenn. Code Ann. § 29-38-102 (2012).

-13-

In construing a statute, we attempt to effectuate, rather than frustrate, its purpose where possible. Construing Tenn. Code Ann. § 29-38-116(a) to mean merely that district attorneys may be lawyers for the state or its political subdivisions would inhibit the undisputed remedial aims of the DDLA. In this scenario, district attorneys would be mere standby counsel for localities as opposed to independent parties fully empowered to utilize the DDLA to deter entry into the illegal drug market and shift costs to the beneficiaries of the illegal drug market. As Plaintiffs point out, district attorneys regularly exercise their discretion to initiate criminal prosecutions without first obtaining permission from any political leader.

We are unpersuaded by Manufacturer Defendants' contention that the General Assembly specially included this provision in the DDLA merely to let prosecuting attorneys serve as lawyers to localities. The better interpretation to effectuate the legislative intent of this remedial statute, which we adopt, is that district attorneys may file DDLA claims on behalf of the political subdivisions within their respective judicial districts. While both sides present reasonable interpretations of Tenn. Code Ann. § 29-38-116(a), Plaintiffs' interpretation is, in our judgment, far and away much more likely to give effect to the legislative intent of the remedial purpose of the DDLA and "the legislative intent is not disturbed and the result is not clearly contrary to the language of the statutes . . . ." *Lipscomb*, 32 S.W.3d at 847. We hold that the District Attorney Plaintiffs have standing.

The next and final issue we address is Plaintiffs' issue of whether the Trial Court erred by granting Manufacturer Defendants' motion to dismiss. As our Supreme Court has instructed:

> Our review of a dismissal for failure to state a claim under Rule 12.02 of the Tennessee Rules of Civil Procedure requires us to take the allegations in the complaint as true. *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002). This is because a motion filed under Rule 12.02(6) tests "the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence." *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). By filing their motion to dismiss, the defendants effectively " 'admit[ted] the truth of all of the relevant and material allegations contained in the complaint, but ... assert[ed] that the allegations fail to establish a cause of action.' " *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 516 (Tenn. 2005) (quoting *Leach v. Taylor*, 124 S.W.3d 87, 90 (Tenn. 2004)). As such, courts "should grant a motion to dismiss only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Crews*, 78 S.W.3d at 857. On appeal, we review the "trial court's decision

-14-

to dismiss a petition for failure to state a claim . . . de novo with no presumption of correctness." *Metro. Gov't of Nashville v. Bd. of Zoning Appeals of Nashville*, 477 S.W.3d 750, 754 (Tenn. 2015) (citing *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999)).

*Nelson v. Myres*, 545 S.W.3d 428, 430-31 (Tenn. 2018).

Manufacturer Defendants contend that the DDLA was intended to establish liability for "street dealers," not legal participants in a regulated marketplace such as themselves. In response, Plaintiffs assert that the DDLA makes no distinction between "street dealers" and drug manufacturers. For resolution, we look to the DDLA and other pertinent law.

An illegal drug is defined in the DDLA as "a drug, the distribution of which is a violation of state law." Tenn. Code Ann. § 29-38-104(1) (2012). The DDLA includes a category of "specified illegal drug" meaning "cocaine, heroin, or methamphetamine, or any other drug the distribution of which is a violation of state law." Tenn. Code Ann. § 29-38-104(14) (2012). The illegal drug market is defined as "the support system of illegal drug related operations, from production to retail sales, through which an illegal drug reaches the user." Tenn. Code Ann. § 29-38-104(2) (2012). "A person who knowingly participates in the illegal drug market within this state is liable for civil damages as provided in this chapter . . . ." Tenn. Code Ann. § 29-38-105(a) (2012). The DDLA defines a "person" as "individual, governmental entity, corporation, firm, trust, partnership, or incorporated or unincorporated association, existing under or authorized by the laws of this state, another state, or foreign country." Tenn. Code Ann. § 29-38-104(11) (2012). Participation in the illegal drug market means "to distribute, possess with an intent to distribute, commit an act intended to facilitate the marketing or distribution of, or agree to distribute, possess with an intent to distribute, or commit an act intended to facilitate the marketing or distribution of an illegal drug . . . ." Tenn. Code Ann. § 29-38-104(9) (2012). The drugs at issue in this case are classified by Tennessee as Schedule II and include hydrocodone, hydromorphone, oxycodone, and oxymorphone. *See* Tenn. Code Ann. § 39-17-408(b)(1)(F), (G), (M), & (N) (2018). Schedule II drugs require, except when administered directly to a patient by a doctor, a prescription from a healthcare provider in order to be dispensed lawfully. *See* Tenn. Code Ann. § 53-11-308(a) (Supp. 2018).

No Tennessee case provides guidance on whether drug manufacturers may be liable under the DDLA. Manufacturer Defendants point to three principal cases from other jurisdictions in support of their position. In *Schafer v. Shopko Stores, Inc.*, 741 N.W.2d 758, 762 (S.D. 2007), the South Dakota Supreme Court affirmed the grant of summary judgment in favor of a pharmacy, finding that "[t]here is no evidence that the

Legislature adopted the DDLA for any purpose other than to impose civil liability on illegal drug dealers." In *Whittemore v. Owens Healthcare-Retail Pharmacy, Inc.*, 111 Cal. Rptr. 3d 227, 232 (3d Dist. 2010), a California appellate court affirming the dismissal of a lawsuit held that, although a pharmacy's employee could be liable, the defendant pharmacies could not be liable because "they did not 'knowingly' participate in the marketing of the drugs . . . ." Finally, in *Cooper v. Purdue Frederick Company, Inc.*, No. 08-3757, 2008 WL 11355004, at *3 (E.D. La. Nov. 5, 2008), a federal court flat out stated that "[t]he Louisiana Drug Dealer Act establishes 'a cause of action against drug dealers,' not pharmaceutical companies."

With respect to these cases from other jurisdictions, they are not binding on this Court. The DDLA does not confine itself to "street drugs" or "street dealers." What matters under the DDLA is that a person, as defined in the Act, knowingly participates in the illegal drug market. A "person" may be a corporate entity, and a drug's legality depends on the context—that is, whether it is prescribed, whether its sale or distribution conforms to state law, etc. Manufacturer Defendants posit that, by definition, they cannot be drug dealers under the DDLA. They point out that the drugs they produce are FDA-approved and DEA-regulated. That, however, begs the question. Drug manufacturers cannot, as is alleged here, knowingly seek out suspect doctors and pharmacies, oversupply them with opioids for the purpose of diversion, benefit from the process, and then cynically invoke their status as otherwise lawful companies to avoid civil liability. The common perception of a drug dealer may be that of the street dealer, but the DDLA does not make that distinction.

We acknowledge that, in conformity with state and federal law, the manufacture of opioids is a legitimate endeavor. There are perfectly sound medical applications for these drugs. Our interpretation of the DDLA is not that drug manufacturers are liable every time one of their products is misused by a third party. We do, however, reject the view that a drug manufacturer can never be liable under the DDLA even when it *knowingly* exceeds the boundaries of its regulated framework, as is alleged here. We find no support in the DDLA for Manufacturer Defendants' contention that they are exempt from the Act.

Having determined that drug manufacturers may be liable under the DDLA, we now need determine whether Plaintiffs' complaint is sufficient to survive Manufacturer Defendants' motion to dismiss. We are required to accept Plaintiffs' allegations as true at this stage. Plaintiffs' 100-plus page Third Amended Complaint contains a litany of allegations, some highly specific, as to Manufacturer Defendants' activities with regard to the diversion of opioids in Tennessee, as well as the destruction in communities caused by this diversion. If Plaintiffs' allegations are correct, as, again, we must presume them to be at this motion to dismiss stage, Manufacturer Defendants knowingly flooded the

affected areas with drugs they *knew* were to be diverted. Plaintiffs do not allege that these events occurred simply as a result of neglect. For example, Plaintiffs allege that Manufacturer Defendants actively identified suspect pharmacies to provide with opioids. According to Plaintiffs, Manufacturer Defendants *knew* about the whole sequence and actively enabled it from the top down for the sake of profit. Manufacturer Defendants are alleged to have knowingly participated in the illegal drug market in Tennessee. That is the basis for civil liability under the DDLA whether one's headquarters is an office building or a back alley.

Whether Plaintiffs can prove their allegations against Manufacturer Defendants is another matter entirely. We take no position on that. We hold only that Plaintiffs alleged enough in their Third Amended Complaint to survive Manufacturer Defendants' motion to dismiss for failure to state a claim. Manufacturer Defendants did not meet their burden at this motion to dismiss stage of showing " 'that the plaintiff[s] can prove no set of facts in support of the claim that would entitle the plaintiff[s] to relief.' " *Nelson,* 545 S.W.3d at 431 (quoting *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002)). We reverse the judgment of the Trial Court, and remand for this case to proceed.

## Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for collection of the costs below and for further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellees, Endo Health Solutions, Inc., Endo Pharmaceuticals, Inc., Purdue Pharma, L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., Mallinckrodt LLC, and Teva Pharmaceuticals USA, Inc.

_____
D. MICHAEL SWINEY, CHIEF JUDGE